**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3092
_____

ANGELA READING,
                    Appellant

v.

NORTH HANOVER TOWNSHIP, NEW JERSEY;
ROBERT DUFF, in his individual capacity and in his official
capacity as Chief of Police for North Hanover Township;
HELEN PAYNE, in her individual capacity; COLONEL
WES ADAMS, in his individual capacity and in his official
capacity as Commander, Joint Base McGuire-Dix-Lakehurst
(JB MDL) and 87th Air Base Wing, JB MDL, New Jersey;
COLONEL ROBERT GRIMMETT, in his individual
capacity and in his official capacity as Commander of the
87th Mission Support Group of the U.S. Air Force; LT. COL.
MEGAN HALL, in her individual capacity and in her official
capacity as a Lieutenant Colonel in the U.S. Air Force and
Deputy Commander of the 87th Security Forces Squadron;
MAJOR NATHANIEL LESHER, in his individual capacity
and in his official capacity as a Major in the U.S. Air Force;
MAJOR CHRISTOPHER SCHILLING, in his individual
capacity and in his official capacity as a Major in the U.S.
Army Reserve; JOSEPH VAZQUEZ, in his individual
capacity and in his official capacity as a Civilian U.S.

Department of the Air Force Employee; COLONEL MITCHELL WISNIEWSKI, in his individual capacity and in his official capacity as Deputy Commander, Joint Base McGuire-Dix-Lakehurst and Commander Army Support Activity

_____

On Appeal from the United States District Court for the District of New Jersey
(D.C. No. 1-23-cv-01469)
District Judge: Honorable Karen M. Williams

_____

Argued on September 4, 2024

Before: JORDAN, HARDIMAN, and PORTER, *Circuit Judges*.

(Filed: December 20, 2024)

Christopher A. Ferrara [Argued]
Thomas More Society
420 Route 46 East
Suite 12
Fairfield, NJ 07004

Michael G. McHale
Thomas More Society
10506 Burt Circle
Suite 110
Omaha, NE 68114

Brennan Tyler Brooks
Thomas More Society
309 W Washington Street
Suite 1250
Chicago, IL 60606

       *Counsel for Appellant*

Walter F. Kawalec, III [Argued]
Marshall Dennehey
15000 Midlantic Drive
Suite 200, P.O. Box 5429
Mt. Laurel, NJ 08054

       *Counsel for Appellees Township of North*
       *Hanover and Robert Duff*

Michael V. Madden [Argued]
Madden & Madden, P.A.
108 Kings Highway East
Suite 200
Haddonfield, NJ 08033

       *Counsel for Appellee Helen Payne*

Brian M. Boynton
Philip R. Sellinger
Daniel Tenny
Graham White [Argued]
United States Department of Justice
950 Pennsylvania Avenue NW
Room 7215
Washington, DC 20530

*Counsel for Appellees Colonel Wes Adams, Colonel Robert Grimmett, Lt. Col. Megan Hall, Major Nathaniel Lesher, Major Christopher Schilling, Joseph Vazquez, and Colonel Mitchell Wisniewski*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This interlocutory appeal arises under the First Amendment to the Constitution. Angela Reading, a mother and former school board member, alleged that federal and local government officials violated her right to free speech by engaging in a campaign of censorship and retaliation after she posted comments on Facebook. She requested a preliminary injunction to prohibit those officials from further interfering with her First Amendment rights. After the District Court denied her motion, Reading appealed. Although much of the government actors' behavior was beyond the pale, the record does not show a substantial risk that their acts of censorship and retaliation will recur. So Reading lacks standing to seek a preliminary injunction. We will affirm.

I

A

The controversy that gave rise to this case unfolded at the Upper Elementary School (UES or School) in the North

Hanover Township School District. As part of its 2022 "Week of Respect," the School invited students to design posters "demonstrat[ing] that UES [is] a safe place where everyone [is] accepted." App. 185. Some students offered "messages of general acceptance," while others supported more specific causes. *Id.*

One such poster, anchored in the center by the acronyms "LGBTQ" and "UES," featured descriptions of various sexual identities and their corresponding flags. App. 125. The poster included a "bi" flag, a "genderfluid" flag, and a "polysexual" flag, among others. *Id.* It announced that "different is cool" and instructed students that "you are who you are." *Id.*

Angela Reading first saw the poster when she attended the School's "Math Night." App. 123. After her seven-year-old daughter asked what the word "polysexual" meant, she was "livid." *Id.* She took her concerns to social media. In a lengthy post to the "NJ Fresh Faced Schools" Facebook page, Reading wondered why an elementary school would permit its students to "research topics of sexuality," and worried that adults were "talking about their sexual life" with her children. *Id.* She called the poster "perverse" and argued that it "should be illegal to expose my kids to sexual content." *Id.* Although "[k]ids should respect differences," Reading explained, they "should not be forced to learn about and accept concepts of sexuality in elementary school." *Id.* Reading concluded the post by noting that her comments were "made in [her] capacity as a private citizen and not in [her] capacity as a [school] board member." App. 125.

Reading's post quickly drew the ire of military personnel at nearby Joint Base McGuire-Dix Lakehurst, some of whom had children at the School. Major Chris Schilling was

5

especially fixated on the post. In an email to local parents, Schilling complained that Reading's post was "filled with too many logical fallacies to list." App. 126. He accused her of "try[ing] to over sexualize things" to "give her arguments more power," insisting that she did "not hav[e] the proper resources and/or education on the matter." *Id.* Schilling was "very concern[ed]" that Reading served as a local school board member. *Id.*

Writing from his personal email account, Schilling also worried that Reading would "stir[] up right wing extremists." App. 127. He raised this alarm in another email to parents, warning that Reading's post "could needlessly injure the school and others in the community." *Id.* He encouraged parents to speak out against Reading and to "keep the pressure on until her disruptive and dangerous actions cease." App. 131.

The controversy grew when Schilling elevated his concerns to the leadership at Joint Base McGuire-Dix Lakehurst. Now writing from his military email account, Schilling cautioned Major Nathaniel Lesher that Reading's post could "give[] a road map to anyone looking to make a statement, political, ideological, or even violent." App. 132–33. In response, Major Lesher promised to forward the issue to Robert Duff, the Chief of Police for Hanover Township. After Reading's post gained modest traction online, Schilling once again contacted Lesher, who vowed to "push this again" to Duff. App. 135–36.

Instead of de-escalating the matter to the Hanover Township Police, the situation intensified when more military personnel got involved. Air Force Antiterrorism Program Manager Joseph Vazquez wrote that Reading's post "really gets under my skin for sure." App. 137. He assured Major

Schilling that he was "sending this to our partners with NJ Office of Homeland Security and Preparedness as well as the NJ State Police Regional Operations Intelligence Center," which "keep an eye on far right/hate groups." *Id.* And Lieutenant Colonel Megan Hall advised two local school superintendents, including Defendant Helen Payne, that Reading's posts "have created a concern for the safety of our military children and families." App. 141. She worried that they "could become targets from extremist personnel/groups." *Id.*

Major Schilling reported his colleagues' involvement to parents in the community. In an email sent from his personal account, Schilling explained that he had been "actively working with the base leadership over the past few days" and that "they are working to support us in our efforts." App. 139.

Schilling's efforts bore fruit. On November 30, Chief Duff successfully convinced Nicole Stouffer, the administrator of "NJ Fresh Faced Schools," to remove Reading's post from the page. As Stouffer described the episode,

> While professing that he was not actually ordering me to take the post down, Duff intimidated me into doing so by telling me that the post, and Mrs. Reading, were under investigation by Homeland Security because of the supposed potential for the post to cause a school shooting like the one that had occurred at Uvalde Texas, or a mass shooting like the one that had occurred at a gay nightclub in Colorado. Duff told me that the "threat" posed by this innocuous post was such he had had to provide extra security for the North Hanover schools

7

because of the threat of violence. He was clearly and unequivocally pressuring me to censor the post while trying to pretend that he was not doing so.

App. 304. After briefing military personnel on this development, Chief Duff promised to "continue to see if I can get additional posts removed from other social media posts." App. 143.

The controversy didn't end there. One comment on Reading's post revealed the "location" of upcoming school board meetings, which were held at "times . . . publicly listed on the school website." App 153. So even though Reading's post had been taken down, Major Schilling feared that outsiders might still endanger the community. Worried for the "military parents [who] attend these meetings," Schilling sought even more support from base leadership. *Id.* So Antiterrorism Program Manager Vazquez forwarded Schilling's concerns to the New Jersey Office of Homeland Security and Preparedness, who in turn notified the Burlington County Prosecutors Office Counter-Terrorism Coordinator. Meanwhile, Chief Duff offered to "continue to monitor social media and take appropriate action if needed." App. 160.

Many of these developments were shared with the public. In a "Community Update" email, Superintendent Payne stated that recent events had "caused safety and security concerns for many families" and offered the following assurance:

[t]he safety and security of our students and staff is always of primary importance, and ensuring that has been my first priority, even as we

responded to this situation over the past couple of days. I assure you that I have been in continuous close contact with the North Hanover Police and they have been very supportive and present for us. They are taking any risks very seriously, are aware of our concerns and have been working on their end to provide any support we need.

App. 186. On top of these public-facing comments, Superintendent Payne and Chief Duff privately lambasted Reading in a string of text messages to each other. Duff called Reading "sick in the head," to which Payne responded, "[o]ld news." App. 267. Duff asserted that Reading "should know better and keep her mouth shut," to which Payne responded, "She can't. She is not capable." App. 279.

Major Schilling gave an update of his own. In a post to the Northern Burlington Parents Facebook page, he acknowledged that "[t]he current situation involving Mrs[.] Reading's actions has caused safety concerns for many families." App. 165. But "[t]he Joint Base leadership takes this situation very seriously," and "Security Forces [are] working with multiple state and local law enforcement agencies to monitor the situation to ensure the continued safety of the entire community." *Id.*

These efforts led to what Reading calls "an over-the-top show of force" at the next Board of Education meeting on December 13. Reading Br. 25. She claims that Chief Duff arranged for "a multi-jurisdictional battalion of armed police officers, install[ed] a metal detector, and requir[ed] bag searches." *Id.* Reading alleged that "panic-stricken attendees assailed" her at the meeting, "falsely accusing her of

9

jeopardizing school safety when no 'threat' had ever materialized." *Id.*

Reading defended herself in the media. She emailed government officials, appeared on national television, and was interviewed on local radio. She also published articles on a blog, which covered topics ranging from government censorship to developments in education policy.

After these events, Reading maintains that her "life and career were radically altered for the worse." Reading Br. 5. Since the controversy began, Reading lost a job offer, resigned from her position on the Northern Burlington County Regional School Board, and withdrew her children from public schools. She blames Defendants, whose conduct "rendered [her] a pariah in her community." Reading Br. 28.

All of this—emails, phone calls, text messages, community letters, heightened security, and referrals to counter-terrorism authorities—because of a single Facebook post.

B

Reading sued local officials and military personnel. She alleged, among other things, violations of her First Amendment free speech rights.[1] Her complaint sought

---

[1] Defendants include local officials—North Hanover Schools Superintendent Helen Payne and Hanover Chief of Police Robert Duff—as well as military personnel—Colonel Wes Adams, Colonel Robert Grimmett, Colonel Mitchell Wisniewski, Lieutenant Colonel Megan Hall, Major Nathaniel

compensatory and punitive damages, as well as injunctive and declaratory relief.

Shortly after filing her amended complaint, Reading moved for a preliminary injunction. She asked the Court to bar Defendants from censoring, attempting to censor, pressuring others to censor, or adopting censorship policies about Reading's protected speech. She also sought to prohibit Defendants from "threat-tag[ging]" her speech or otherwise referring it to law enforcement, and to require Defendants to "undergo regular First Amendment training." App. 206–07.

The District Court considered whether Reading had standing to seek injunctive relief, but it ultimately denied the motion because Reading failed to show irreparable harm. Reading timely appealed.

II

Reading invoked the District Court's jurisdiction under 28 U.S.C. § 1331, and our jurisdiction lies under 28 U.S.C. § 1292(a)(1). We review the District Court's legal conclusions de novo and its order denying the preliminary injunction for abuse of discretion. *See Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022). Because this is a First Amendment case, the Court "must conduct an

---

Lesher, Major Christopher Schilling, and Air Force Antiterrorism Program Manager Joseph Vazquez.

independent examination of the factual record as a whole." *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

A preliminary injunction is an extraordinary remedy. *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024). To obtain one, the plaintiff must show that "[(1)] [she] is likely to succeed on the merits, that [(2)] [she] is likely to suffer irreparable harm in the absence of preliminary relief, that [(3)] the balance of equities tips in [her] favor, and that [(4)] an injunction is in the public interest." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## III

### A

Before considering the prerequisites for a preliminary injunction, we turn to jurisdiction. The District Court declined to resolve Reading's motion for preliminary injunction on standing grounds, instead denying relief because Reading failed to show irreparable harm. After all, the requirements for standing and irreparable harm are similar, and courts often discuss them together. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("[C]ase or controversy considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.'" (citation omitted)). But in preliminary injunction cases, the doctrines often do distinct work: the likelihood of harm concerns justiciability, while the character of that harm is a question of remedies. *See* Douglas Laycock, The Death of the Irreparable Injury Rule 220–22 (1991). Because this motion turns on the likelihood, rather than the character, of Reading's purported harms, we

analyze her motion through the lens of Article III standing.[2]

B

The jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. And "[u]nder Article III, a case or controversy can exist only if a plaintiff has standing to sue." *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 286 (3d Cir. 2023) (citation omitted). To establish Article III standing, a plaintiff must "show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (cleaned up). The plaintiff has to satisfy these requirements, which she must do "for each form of relief that [she] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).[3]

_____

[2] We agree with the District Court that "[r]egardless of how [Reading's] failure is described, the result is the same: Plaintiff will not receive her injunction." *Reading v. N. Hanover Twp.*, 2023 WL 7986408, at *7 n.9 (D.N.J. Nov. 17, 2023). Still, when justiciability and hence our power to order relief is in question, we must address that issue first.

[3] Because this interlocutory appeal concerns only Reading's request for a preliminary injunction, we limit our standing inquiry to that form of relief. *See Lyons*, 461 U.S. at 105 (holding that a plaintiff must establish standing to seek a preliminary injunction even when he also seeks damages).

Where, as here, the plaintiff seeks prospective relief to address future harm, she must show that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). Evidence of "past exposure to illegal conduct" does not automatically justify an injunction against future violations, *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974), but it is relevant as "a launching pad for a showing of imminent future injury," *Murthy*, 603 U.S. at 59.

C

Reading advances two theories of standing to support her request for a preliminary injunction. The first involves future injury. To succeed on this theory, Reading must show that at least one defendant is likely to censor her speech, to coerce a third party to censor her speech, or to retaliate against her for engaging in speech. "On this record, that is a tall order." *Id.* at 58.

Reading's primary evidence of future harm is the predictive value of Defendants' past conduct. Her emphasis is understandable, for "[i]f a plaintiff demonstrates that a particular Government defendant was behind her past social-media restriction, it will be easier for her to prove that she faces a continued risk of future restriction that is likely to be traceable to that same defendant." *Id.* at 59. But "easier" does not mean automatic. For example, in *Murthy v. Missouri*, the Supreme Court considered a request for a preliminary

Because "standing is not dispensed in gross," we leave for the District Court the question of whether Reading has standing to pursue her claims for damages or declaratory relief. *TransUnion*, 594 U.S. at 431.

14

injunction barring a host of government defendants from coercing the removal of plaintiffs' social media posts. Plaintiffs argued that because the Government defendants had coerced the removal of their social media posts in the past, there was a substantial risk they would do so again. The Supreme Court disagreed. And it did so because the Government's alleged suppression campaign "had considerably subsided" by the time plaintiffs sued, so even the strongest evidence of past censorship could not show "a likelihood of future injury traceable to" the Government defendants. *Id.* at 71–72.

*Murthy* dictates the outcome in Reading's case. The bulk of Defendants' allegedly unlawful conduct took place during a three-week period, and almost all of it ended by mid-December 2022. Superintendent Payne sent her "Community Update" on December 1; Chief Duff's heightened security ended upon the conclusion of a school board meeting on December 13; and the Federal Defendants' spate of communications slowed significantly by December 5. Indeed, during oral argument, Reading's counsel could not identify any unlawful acts by Defendants since the initial events nearly two years ago. Even if Defendants engaged in a conspiracy to deprive Reading of her First Amendment right to speak freely during the final weeks of 2022, any threat "had considerably subsided" by the time she sued in March 2023. *Id.* at 71.

Reading's counterarguments are unpersuasive. She first quotes the Supreme Court's statement in *Susan B. Anthony List v. Driehaus* that Defendants' "refusal to 'disavow' past enforcement . . . indicate[s] a credible threat of recurrence." Reply Br. 4 (quoting *Driehaus*, 573 U.S. at 164–65). Her reliance on *Driehaus* is misplaced. That case involved a preenforcement challenge to an Ohio law that "prohibit[ed]

15

certain 'false statements' during the course of a political campaign." 573 U.S. at 151–52. In finding a "substantial risk" that the law would be enforced against the plaintiff, the Court relied on the Ohio Elections Commission's refusal to disavow the possibility of *future* enforcement, not its failure to apologize for past transgressions. *See id.* at 165. Unlike the Commission in *Driehaus*, here the law enforcement Defendants confirmed that they are not presently surveilling Reading and have no plans to do so. The record supports them on that score. While Reading continues to author blog posts about the appropriateness of "LGBTQ+ issues in public schools," App. 375–76, Defendants have done nothing more to silence or retaliate against her.

Reading also argues that the "voluntary cessation" doctrine excuses her failure to show a likelihood of future harm. That exception to the mootness rule provides that "a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). And it ensures that a defendant cannot "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Id.* Unable to make out a likelihood of future harm, Reading relies on this doctrine to try to shift her burden of proof—under the voluntary cessation exception, it is *Defendants* who must make "absolutely clear that [their] allegedly wrongful behavior could not reasonably be expected to recur." Reply Br. 12 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000)). Because they have not made this

16

showing, Reading suggests, we have jurisdiction to reverse the District Court's order.

We disagree because Reading cannot recharacterize as mootness what is really a question of standing. This is not a case where Reading once had standing to seek injunctive relief but lost it during the pendency of litigation. Instead, "the issue here" is whether Reading "meets the preconditions for asserting an injunctive claim in a federal forum." *Lyons*, 461 U.S. at 109. Because Reading has not since the filing of her action established a likelihood of future harm, the doctrines of mootness and voluntary cessation provide her no refuge.

Reading's second theory of injury—that she suffers present harms because of Defendants' past suppression campaign—fares no better than the first. She claims that the specter of government censorship and retaliation has chilled her freedom of speech, and only a preliminary injunction will enable her to "resume full-throated advocacy for her point of view." Reply Br. 6. But even assuming Reading has been deterred from speaking,[4] we have made clear that "'generalized allegations' of chilled speech cannot establish an existing injury" under Article III. *Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 269 (3d Cir. 2020) (citation omitted). To hold otherwise would allow plaintiffs to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Thus, "an allegation

---

[4] Because Reading has appeared on a national television program, participated in a local radio interview, and authored many blog posts about this controversy, she has apparently overcome whatever "subjective chill" she once experienced.

17

that certain conduct has (or will have) a chilling effect on one's speech must claim a threat of specific future harm." *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 220 (3d Cir. 2023) (cleaned up). Because Reading cannot show a likelihood of future harm, she likewise cannot prevail on her theory of present self-censorship.[5]

\* \* \*

Reading's allegations are serious and raise important questions under the Free Speech Clause of the First Amendment. Reading expressed concern about whether her seven-year-old daughter was being exposed to sexual topics that have no place in an elementary school. Regardless of whether one agrees with Reading's concern, the record suggests that Defendants' response to her blog post was, to put it mildly, disproportionate. Although that past conduct may very well result in remedies for damages or declaratory relief, this narrow appeal concerns only Reading's standing to seek a preliminary injunction. And because Reading has not shown a likelihood of future injury, she lacks standing to seek that form of relief. We will affirm the District Court's order denying

---

[5] As further evidence of "ongoing harm, retaliatory 'investigation' and 'threat-tagging,'" Reading points to a recently filed declaration asserting that she has been "stripped of [her] 'Trusted Traveler' status under the CLEAR Program." Reading Decl. 5. If true, this disturbing evidence does not establish standing for a preliminary injunction here because neither the Department of Homeland Security nor the Transportation Security Administration is a named defendant. To the extent Reading casts heightened airport screening as an ongoing *effect* of Defendants' conduct, she "ha[s] a redressability problem." *Murthy*, 603 U.S. at 73.

Reading's motion for a preliminary injunction and remand for further proceedings consistent with this opinion.