**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2558
_____

In re: S.S. BODY ARMOR I., INC., f/k/a Point Blank
Solutions Inc. f/k/a DHB Industries, Inc., et al., Debtors

v.

CARTER LEDYARD & MILBURN LLP, Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civ. Action No. 1-18-cv-00634)
District Judge: Hon. Gregory M. Sleet
_____

Argued
April 16, 2019
_____

Before: AMBRO, GREENAWAY, JR., and SCIRICA,
*Circuit Judges*.

(Opinion Filed: June 25, 2019)

Laura D. Jones
James E. O'Neill
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801

Alan J. Kornfeld [ARGUED]
Pachulski Stang Ziehl & Jones
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

     *Counsel for Debtor-Appellee SS Body Armor I, Inc.*

Michael Busenkell
Gellert Scali Busenkell & Brown
1201 North Orange Street
Suite 300
Wilmington, DE 19801

Gary D. Sesser [ARGUED]
Carter Ledyard & Milburn
2 Wall Street
New York, NY 10005

     *Counsel for Plaintiff-Appellant Carter Ledyard &
     Milburn*

Scott J. Leonhardt
The Rosner Law Group
824 North Market Street
Suite 810

Wilmington, DE 19801

James H. Hulme
Arent Fox
1717 K Street, N.W.
Washington, DC 20036

Frederick B. Rosner
Messana Rosner & Stern
1000 North West Street
Suite 810
Wilmington, DE 19801

*Counsel for Defendant-Appellee Recovery Trustee*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge.*

This procedurally-complex case stems from financial crimes at a public company, which led to a peculiar confluence of events: criminal convictions of the company's top executive, the executive's unforeseen death while in custody, several class action and derivative lawsuits, a number of proposed settlement agreements, ongoing bankruptcy proceedings, and numerous disputes spanning across three levels of the federal judiciary in three separate jurisdictions. At this point, however, we are faced with a single appeal that raises two specific issues—a jurisdictional issue and a merits issue. Here, upon assuring ourselves of our appellate

3

jurisdiction, we will affirm the underlying order for the reasons set forth below.

## I. BACKGROUND

In the mid-2000s, David Brooks ("Brooks"), Chairman and Chief Executive Officer ("CEO") of SS Body Armor I, Inc. ("Debtor"), was charged with a panoply of financial crimes. In response to a slew of class action and derivative lawsuits consolidated in the United States District Court for the Eastern District of New York ("EDNY"), Debtor proposed a global settlement agreement ("First Settlement Agreement") worth approximately $48 million and that, among other things, indemnified Brooks for liability under section 304 of the Sarbanes Oxley Act of 2002 ("SOX 304"), 15 U.S.C. § 7243.[1]

D. David Cohen ("Cohen"), former General Counsel and a shareholder of Debtor, objected to the First Settlement Agreement on the ground that the SOX 304 indemnification provision was unlawful. After the EDNY district court overruled his objection and approved the settlement agreement, Cohen pursued an appeal to the United States Court of Appeals for the Second Circuit ("Second Circuit"), represented by Carter Ledyard & Milburn LLP ("CLM"). The Second Circuit agreed with Cohen, holding that the settlement

---

[1] In pertinent part, SOX 304 authorizes the Securities and Exchange Commission ("SEC") to claw back, or recoup, performance-based compensation paid to CEOs where financial statements must be restated as a result of misconduct. *Id.* The SEC pursued this liability, allegedly valued at around $186 million, in the United States District Court for the Southern District of Florida ("SDFL").

agreement's indemnification of Brooks violated SOX 304 and thus required vacatur of the EDNY district court's order approving of the agreement. In so doing, the Second Circuit noted that the EDNY district court would ultimately have to determine the appropriate attorneys' fees to award CLM.

Around the time the Second Circuit upended the First Settlement Agreement, Debtor initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). With that, the Bankruptcy Court effectively took control over the EDNY litigation, as any settlement would need to be approved by the Bankruptcy Court. Eventually, the Bankruptcy Court confirmed Debtor's liquidation plan that, among other things, established a recovery trustee ("Recovery Trustee") to pursue Debtor's interest in further recouping its losses from the ongoing EDNY and SDFL actions.

While the bankruptcy proceedings continued, Brooks died in prison. Because his criminal appeal had not yet concluded, some of his convictions and the concomitant restitution obligations imposed during the prosecution were abated. In light of this shift in the landscape, various stakeholders negotiated another global settlement agreement ("Second Settlement Agreement") to resolve all outstanding claims. Under that agreement, approximately $142 million of Brooks' restrained assets were agreed to be distributed to various victims of his financial crimes. Of that $142 million, roughly $70 million has recently been remitted to Debtor.

Meanwhile, still seeking its attorneys' fees for preserving the SOX 304 claim nearly a decade prior, CLM initiated a series of filings. First, it filed a fee application in the Bankruptcy Court. In that application, CLM indicated that

5

it billed 1,502.2 hours and incurred fees totaling $549,472.61 in connection with the SOX 304 claim. Using a lodestar multiplier of 3.38, CLM thus sought an attorneys' fees award of $1.86 million, representing 1% of the potential SOX 304 liability it had preserved. In ruling on the fee application, the Bankruptcy Court purported to award CLM attorneys' fees but did not quantify the exact amount of the award. Instead, the Bankruptcy Court ruled that the amount of the award would be determined in the future, if and when Debtor actually received any funds on account of the SOX 304 claim. The Bankruptcy Court's ruling made clear, however, that CLM would not be entitled to any award if Debtor were to never receive any funds on account of the SOX 304 claim. Concerned of the potential to receive nothing, CLM appealed the fee application order ("Fee Application Appeal") to the United States District Court for the District of Delaware ("District Court"). Fully briefed, the Fee Application Appeal remains pending at the District Court.

CLM next filed a motion with the Bankruptcy Court requesting that a $25 million reserve be set aside from which its attorneys' fees could be paid. Without determining the exact amount of attorneys' fees owed to CLM, the Bankruptcy Court granted the motion in part, ordering Debtor to set aside $5 million from any settlement funds until resolution of CLM's fee application. Believing $5 million to be insufficient, CLM appealed the Bankruptcy Court's fee reserve order ("Fee Reserve Appeal") to the District Court. Fully briefed, the Fee Reserve Appeal also remains pending at the District Court.

In the Bankruptcy Court, CLM then moved for a stay of any distributions from the Second Settlement Agreement pending its Fee Reserve Appeal. The Bankruptcy Court denied the motion. CLM subsequently appealed—in a new appeal,

6

not the pending Fee Reserve Appeal—the Bankruptcy Court's stay denial order ("Stay Denial Appeal") to the District Court. In its Stay Denial Appeal, CLM filed an emergency motion ("Emergency Stay Motion") requesting the District Court to stay distributions from the Second Settlement Agreement pending resolution of the Fee Reserve Appeal, in which it was now requesting a $15 million fee reserve. Debtor and the Recovery Trustee (collectively "Appellees") opposed the motion, which the District Court eventually denied. From that denial, CLM now appeals to us.

This case thus presents us with two questions. First, do we have jurisdiction to hear this appeal? Second, if we have jurisdiction, did the District Court correctly deny CLM's Emergency Stay Motion? For the reasons set forth below, we answer each question in the affirmative.

## II. JURISDICTIONAL ISSUE

CLM argues that we have appellate jurisdiction because the District Court's denial of the Emergency Stay Motion qualifies as a final order under 28 U.S.C. § 158(d)(1) or, alternatively, as an injunctive order under 28 U.S.C. § 1292(a)(1). We agree on the first ground for jurisdiction and thus do not reach the second ground.

Under 28 U.S.C. § 158(d)(1), we have jurisdiction over appeals of "all final decisions, judgments, orders, and decrees" entered by a district court reviewing a bankruptcy court's order in an appellate capacity. For us to have jurisdiction under the statute, however, both relevant district court and bankruptcy court orders must be final. *See In re White Beauty View, Inc.*, 841 F.2d 524, 525–26 (3d Cir. 1988); *In re Klaas*, 858 F.3d

7

820, 825 (3d Cir. 2017). We address the finality of each order in turn.

## A. Finality of District Court's Order

Since we have no direct precedent on the finality of the relevant District Court order, we look chiefly to *In re Revel AC, Inc.*, 802 F.3d 558 (3d Cir. 2015) (Ambro, J.), our most factually analogous case.[2] There, the bankruptcy court entered an order authorizing a debtor to sell its casino property free and clear of any tenancies. *See Revel*, 802 F.3d at 564. An aggrieved tenant appealed the sale authorization order to the district court and moved to stay the sale pending the appeal. *See id.* After the district court denied a stay, but while the underlying appeal was still pending in the district court, the tenant appealed the stay denial to us. *See id.* at 566. Importantly, the sale was scheduled to close imminently and, once it did, the tenant's possessory interest in the property would be lost forever given a statute under which reversing a sale authorization order does not affect the validity of the sale itself. *See id.* at 564–65, 567. Noting that "the upshot of declining the [tenant's] stay request [was] to prevent it from obtaining a full airing of its issues on appeal and a decision on the merits," we ruled that the district court's order was final. *Id.* at 567. More specifically, we held that "where it is all but assured that a statute will render an appeal moot absent a stay,

---

[2] Our decision in *In re Trans World Airlines, Inc.*, 18 F.3d 208 (3d Cir. 1994), is inapposite because that case, unlike this case, involved a district court's *grant* of a stay request. *Id.* at 216.

8

a stay denial is appealable under [28 U.S.C.] § 158(d)(1)." *Revel*, 802 F.3d at 567.

Here, a *statute* would not render CLM's Fee Reserve Appeal moot absent a stay. Accordingly, the instant appeal does not fit within the express terms of *Revel*'s precise holding. But this appeal does fit within *Revel*'s dicta, to which we give teeth today.

Indeed, denying CLM's request for a stay of seemingly imminent distributions effectively—even though not necessarily by statute—moots its pending Fee Reserve Appeal. If Debtor is allowed to freely distribute the proceeds from the Second Settlement Agreement, the District Court will be unable to grant any relief even if it were to ultimately decide that the $5 million fee reserve should have been larger. That is because any funds received by Debtor will be distributed under the liquidation plan as quickly as possible to thousands of creditors, making it nearly impossible for CLM to claw back any funds to which it may later be deemed entitled. *See* App. 184–85 (the Bankruptcy Court's recognizing that "whatever [assets] come[] into [Debtor's] estate will be distributed . . . as quickly as possible" and "all the assets [not subject to a reserve] will be disbursed [leaving CLM] with no ability to receive a [greater] fee because there[ will] be no money left to chase").

At oral argument, Debtor's counsel informed us that Debtor has recently received settlement proceeds of $70 million. This only heightens our concern that distributions from the Second Settlement Agreement may be made imminently. If these settlement proceeds are distributed before resolution of CLM's Fee Reserve Appeal, that appeal is "all but assured" to become moot. *Revel*, 802 F.3d at 567.

9

Thus, because "the upshot of declining [CLM's] stay request is to prevent it from obtaining a full airing of its issues on appeal and a decision on the merits," we deem the District Court's stay denial order final under 28 U.S.C. § 158(d)(1). *Revel*, 802 F.3d at 567. Especially in this bankruptcy context—where we have adopted a relaxed, pragmatic, and functional view of finality in lieu of the traditional, technical view, *see In re Comer*, 716 F.2d 168, 171 (3d Cir. 1983)[3]—we do not hesitate in reaching this decision, a mere logical application of *Revel*.

## B. Finality of Bankruptcy Court's Order

We take this same pragmatic approach in assessing the finality of the relevant Bankruptcy Court order. As noted previously, the present appeal involves the District Court's ruling on CLM's Emergency Stay Motion, which was filed in the first instance in the District Court. As a technical matter, therefore, there is no underlying Bankruptcy Court order for us to review for finality, seemingly precluding jurisdiction. *See United States v. Nicolet, Inc.*, 857 F.2d 202, 204 (3d Cir. 1988) ("[S]ection 158(d) is not an available predicate for

---

[3] "We interpret finality pragmatically in bankruptcy cases because these proceedings often are protracted and involve numerous parties with different claims. To delay resolution of discrete claims until after final approval of a reorganization plan, for example, would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." *White Beauty View*, 841 F.2d at 526 (citations omitted).

jurisdiction" where "the original order appealed from was entered by the district court." (citation omitted)).

But the Emergency Stay Motion was filed within the broader context of CLM's Stay Denial Appeal, which formally appealed the Bankruptcy Court's stay denial order. In ruling on the Emergency Stay Motion, the District Court was hence functionally reviewing the Bankruptcy Court's stay denial order. The District Court's own stay denial order evinces that it viewed itself as sitting in an appellate capacity. *See* App. 27 (the District Court's stating that one of the determinations in the Bankruptcy Court's stay denial order did not constitute "an abuse of discretion"); *see also* Appellees' Br. 38 (seemingly conceding that the District Court sat in an appellate capacity by referencing its "correctly review[ing]" a finding of the Bankruptcy Court's stay denial order). CLM's filing of the Emergency Stay Motion thus did no more than hurry the District Court's resolution of the broader Stay Denial Appeal. That the District Court technically ruled on that motion instead of the appeal in which it was filed does not give us pause where, as here, we are to take a relaxed, pragmatic view of finality. *See Comer*, 716 F.2d at 171.[4]

Satisfied that the District Court was effectively reviewing an order of the Bankruptcy Court, we now evaluate whether the underlying Bankruptcy Court order was final. Like the District Court's stay denial order, the Bankruptcy Court's stay denial order "all but assured" that CLM's Fee

---

[4] *Nicolet* is inapplicable to this analysis because that case involved an order issued by a district court exercising its original jurisdiction, not—as in this case—in an appellate role reviewing a bankruptcy court's ruling. 857 F.2d at 203–04.

11

Reserve Appeal would become moot since it opened the door to immediate settlement distributions, which would preclude CLM "from obtaining a full airing of its issues on appeal." *Revel*, 802 F.3d at 567. Thus, for the same reasons that the District Court's order was final, so too was the Bankruptcy Court's order.

* * *

In light of the foregoing analysis, we hold that we have jurisdiction to hear this appeal under 28 U.S.C. § 158(d)(1). Therefore, we need not—and do not—assess whether we also have jurisdiction under 28 U.S.C. § 1292(a)(1). Having assured ourselves of our appellate jurisdiction, we next turn to the merits issue in this case.

## III. MERITS ISSUE

On the merits, CLM asserts that the District Court blundered in denying its Emergency Stay Motion, which sought to stay distributions from the Second Settlement Agreement pending resolution of the Fee Reserve Appeal. On this issue, we first review the law relevant to stay motions, then clarify the applicable standard of review, and finally apply the law to the facts using the appropriate standard. In so doing, we determine that the District Court properly denied the Emergency Stay Motion.

### A. Relevant Law

The Federal Rules of Bankruptcy Procedure allow a party to move to stay the effect of a bankruptcy court order pending a resolution on appeal. *See* Fed. R. Bankr. P. 8007. In ruling on such motions, courts assess four factors, similar to

12

those considered in ruling on applications for preliminary injunctions:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (citations omitted). "In order not to ignore the many gray shadings stay requests present, courts 'balance[] them all' and 'consider the relative strength of the four factors.'" *Revel*, 802 F.3d at 568 (citations omitted).

The Supreme Court has indicated that the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009): whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm, or "harm that cannot be prevented or fully rectified by a successful appeal," *Revel*, 802 F.3d at 568 (internal quotation marks and citation omitted). We have noted that, among these two factors, "the former is arguably the more important piece of the stay analysis." *Id.*

As to the first factor, a strong showing of the likelihood of success exists if there is "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). "While it is not enough that the chance of success on the merits be better than negligible, . . . the likelihood of winning on appeal need not be

more likely than not." *Revel*, 802 F.3d at 569 (internal quotation marks and citations omitted).

To satisfy the second factor, the movant must demonstrate that irreparable injury is "*likely* [not merely possible]" in the absence of a stay. *Id.* (alteration in original) (citation omitted). We understand "likely" to mean "more apt to occur than not." *Id.* (citation omitted).

Upon satisfaction of the first two factors, courts assess the harm to the opposing parties and weigh the public interest. *Nken*, 556 U.S. at 435. In particular, courts balance the harms by weighing the likely harm to the movant absent a stay, the second factor, against the likely harm to stay opponents if the stay is granted, the third factor. *Revel*, 802 F.3d at 569. Courts also evaluate where the public interest lies, the fourth factor, which calls for gauging "consequences beyond the immediate parties." *Id.* (citation omitted).

In *Revel*, we embraced a "sliding-scale" approach to determining how strong a case a stay movant must show. *Id.* (citations omitted). Under this sliding scale, in essence, "[t]he more likely the [movant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more [heavily] need [the balance of harms] weigh in [its] favor." *Id.* (first, third, fourth, and seventh alterations in original) (citation omitted).

Overall, then, all four stay factors are interconnected and the analysis proceeds as follows:

> Did the applicant make a sufficient showing that [(1)] it can win on the merits[—]significantly better than negligible but not greater than

> 50%[—]*and* [(2)] will suffer irreparable harm absent a stay? If it has, we "balance the relative harms considering all four factors using a 'sliding[-]scale' approach. However, if the movant does not make the requisite showings on either of these [first] two factors, the[] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis."

*Id.* at 571 (last three alterations in original) (citation omitted).

## B. Standard of Review

We typically review appeals from the denial of a stay for abuse of discretion, giving proper regard to the district court's feel of the case. *Id.* at 567. But, since the first factor involves a purely legal determination, we review a district court's decision on the likelihood of success *de novo*. *Id.*

## C. Analysis

Here, CLM falters at the very first stay factor. Reviewing the factor *de novo*, we determine that CLM has a fatally low likelihood of succeeding in its Fee Reserve Appeal. This compels us to affirm the District Court's underlying order, even without considering any of the remaining stay factors.

The first stay factor requires us to evaluate whether CLM has shown that it has a "significantly better than negligible" chance of succeeding on the merits of its pending Fee Reserve Appeal. *Id.* at 571. At its core, that appeal asks whether $5 million is an adequate amount to cover the attorneys' fees CLM accrued in connection with its

15

preservation of the SOX 304 claim. Answering that overarching question calls for us to consider—though not conclusively decide—a subsidiary question: what is the appropriate amount of attorneys' fees that CLM should be awarded? We ruminate on that analysis here.

First, we must assess the appropriate method for calculating attorneys' fees at this procedural juncture. There are two such methods used by federal courts—the lodestar approach and the percentage-of-recovery approach. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001). Generally, the lodestar method is used in statutory fee-shifting cases while the percentage-of-recovery method is favored in cases involving a common fund. *See id.*

The lodestar method is the simpler of the two. Under that approach, "court[s] determine[] an attorney's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted). Although the lodestar method "yields a fee that is presumptively sufficient," courts may, in "rare and exceptional circumstances," use a multiplier to adjust the fee award upward or downward. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010) (internal quotation marks and citations omitted); *see Gunter*, 223 F.3d at 195 n.1.

The percentage-of-recovery method is more complex. Generally used in common fund cases—where a litigant creates, discovers, increases, or preserves a fund for the benefit of a group, *see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970)—this method "is designed to allow courts to award fees

16

from the fund in a manner that rewards counsel for success and penalizes it for failure." *Cendant*, 243 F.3d at 732 (internal quotation marks and citation omitted). When analyzing a fee award under this method, courts may consider, among others, seven factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by counsel; and (7) the awards in similar cases.

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005) (Scirica, J.) (citations omitted); *see In re AT & T Corp.*, 455 F.3d 160, 166 (3d Cir. 2006) (Scirica, J.) ("In reviewing an attorneys' fees award in a class action settlement, a district court should consider the *Gunter* factors, the [*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) (Scirica, J.)] factors, and any other factors that are useful and relevant with respect to the particular facts of the case."). Upon doing so, a cross-check using the lodestar method is appropriate. *See Rite Aid*, 396 F.3d at 305. This lodestar cross-check calculation, however, "need entail neither mathematical precision nor bean-counting." *Id.* at 306.

Although the percentage-of-recovery method is often used in common fund cases, courts may apply the lodestar method where "the nature of the settlement evades the precise evaluation needed for the percentage[-]of[-]recovery method."

17

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995); *see also id.* at 821 (stating that a court "may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award"); *Rite Aid*, 396 F.3d at 300 (explaining that the lodestar method is typically applied "where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method" (citation omitted)).

Such is this case. At this particular procedural moment, where the record is unclear as to what portion of the settlement proceeds is attributable to the preserved SOX 304 claim, we opt to employ the lodestar method.[5] At this stay stage, we need only decide whether CLM has demonstrated a sufficient likelihood of success on the merits. The lodestar method allows us to determine this more straightforwardly.[6]

---

[5] We leave it to the discretion of the Bankruptcy Court or District Court whether to apply the lodestar method or percentage-of-recovery method in later stages of this litigation, such as in eventually quantifying CLM's fee application or ruling on its Fee Application Appeal or Fee Reserve Appeal.

[6] If the Bankruptcy Court or District Court chooses to later employ the percentage-of-recovery method, we also leave it to it to decide in the first instance several lingering issues related to that method, such as whether the settlement proceeds constitute a common fund from which CLM is entitled to attorneys' fees, what quantity of proceeds to consider, and how

18

Second, we must now apply our chosen lodestar method. But, to be clear, we do not need to determine at this point the exact amount of attorneys' fees CLM is due. Rather, we must simply decide whether, as both the Bankruptcy Court and District Court concluded, $5 million is an adequate amount to cover the attorneys' fees CLM incurred in preserving the SOX 304 claim. *See* App. 401 (the Bankruptcy Court's stating that "there[ is] a very low likelihood of [CLM's] receiving a fee award in excess of $5 million"); *id.* at 27 (the District Court's stating that it "cannot find that . . . a [$5 million] reserve constitutes an abuse of discretion").

Here, we conclude that the $5 million reserve is sufficient. A $5 million attorneys' fees award for 1,502.2 hours of legal work totaling $549,472.61 of documented fees would yield an hourly rate of $3,328.45 and a lodestar multiplier of over nine. But we have previously noted that, in common fund cases where attorneys' fees are calculated using the lodestar method, "[m]ultiples ranging from one to four" are the norm. *Prudential*, 148 F.3d at 341 (alteration in original) (citation omitted); *see also Cendant*, 243 F.3d at 737–42 & n.22 (collecting a cornucopia of complex and lengthy cases in which highly skilled attorneys spent significant time and effort to establish large common funds, only one of which awarded attorneys' fees using a lodestar multiplier higher than three). At this stage, we see no reason to stray from that range.

To be sure, CLM showed tremendous skill and expended substantial time in preserving a highly valuable claim. But its attempts to argue that it is somehow due

---

much of the proceeds are on account of CLM's preservation of the SOX 304 claim.

19

attorneys' fees more than $5 million are belied by its initial fee application in the Bankruptcy Court. There, CLM sought attorneys' fees totaling $1.86 million using a lodestar multiplier of 3.38, which it stated was "entirely reasonable in light of . . . the value of the asset preserved and benefits conferred, the risks undertaken by counsel[,] and the public policies that were vindicated" by preserving the SOX 304 claim. CLM's Fee Appl. 35, ECF No. 3300 in *In re S.S. Body Armor I, Inc.*, Case No. 10-11255 (Bankr. D. Del. filed Sep. 25, 2015); *see id.* (citing with approval *Prudential* and *Cendant* for the proposition that multipliers up to four are normally awarded in common fund cases). We see no reason why CLM's prior analysis should not hold now, especially given the current record.[7]

---

[7] Although CLM earlier sought a $25 million reserve at the Bankruptcy Court, it now suggests that it is entitled to attorneys' fees ranging between $10 million and $40 million. Although these figures have some purported, arithmetical justification, they are untethered from reality. *See* Appellant's Br. 47 (calculating $40 million in attorneys' fees by arguing that, since the Second Settlement Agreement—which includes the SOX 304 claim—is worth $142 million and the First Settlement Agreement—which did not include the SOX 304 claim—was worth $48 million, CLM conferred a benefit equal to 295% of the First Settlement Agreement and thus should receive attorneys' fees equal to 295% of the $13.5 million already awarded to class counsel). These mathematical machinations are unavailing here, where CLM has itself conceded that attorneys' fees well below $5 million are "entirely reasonable." CLM's Fee Appl. 35, ECF No. 3300 in

Because exceeding a $5 million reserve would demand a lodestar multiplier greater than nine—more than double the top end of the typical range for multipliers in cases like this one—we are confident that a $5 million reserve is sufficient to award CLM the attorneys' fees it is due for preserving the SOX 304 claim. Put another way, at this stage of this litigation, CLM has not carried its burden of demonstrating that it has a "significantly better than negligible" chance of succeeding on the merits of its pending Fee Reserve Appeal. *Revel*, 802 F.3d at 571.

Deciding this first stay factor against CLM is, on its own, fatal to the instant appeal. *See id.* ("[I]f the movant does not make the requisite showings on *either* of these [first] two factors, . . . the stay should be denied without further analysis." (second alteration in original) (emphasis added) (citation omitted)). Accordingly, we need not—and do not—assess any of the remaining factors. In sum, the District Court correctly denied CLM's Emergency Stay Motion.

## IV. CONCLUSION

For the foregoing reasons, we are assured of our appellate jurisdiction and will affirm the District Court's order denying CLM's Emergency Stay Motion.

---

*In re S.S. Body Armor I, Inc.*, Case No. 10-11255 (Bankr. D. Del. filed Sep. 25, 2015).

21